LOTTINGER, Judge.
These two suits were consolidated for purposes of trial and will therefore be treated herein together. The first numbered suit is a rule to show cause, filed by Roller Construction Company against Southern Supply Company, why a material-man’s lien filed against the petitioner in rule by defendant in rule should not be erased and cancelled. The second numbered suit is a suit on open account by Southern Utility Supply Company against Roller Construction Company. At trial, the petitioner in the second suit attempted to amend its petition so as to convert the action to a suit on a promissory note. The Lower Court gave judgment in both suits in favor of Southern Utility Supply Company, and Roller Construction Company has appealed.
The evidence reflects that DeFraites Associates was engaged as consulting engineers for the St. Mary Parish Sewer District No. 2 in the construction of a sanitary sewer system in the Parish of St. Mary, Louisiana. The engineers prepared plans and specifications for the construction of said sanitary sewerage system and same was let for public bidding. Roller Construction Co., the defendant, was the low bidder.
With regard to the portion of the said system about which this suit revolves, the plans and specifications called for a force main pipeline of a length of some 11,000 feet, of which 3,500 feet was on solid ground, on the berm of a levee, and some *111 7,500 feet of which was through marshy-ground, where both stable and unstable soil was found. The pipeline was to be laid relatively straight, with only one or two curves. The specifications of the engineer called for a 12 inch asbestos-cement pipe, of a class 150, to be used on a force main with ring-tite couplings as manufactured by Johns-Manville or approved equal. The specifications further provided that the manufacturer of the pipe should send a representative to the job to properly instruct the contractor on the procedure to be used in making up the joints.
Shortly before or after the award of the bids to Koller Construction Company, the time is immaterial, Mr. Earl Koller,. the president of the company, was approached by the representatives of Keasbey and Mat-tison Company, the manufacturer of K and M pipe, and their supply house in Baton Rouge, Southern Utility Supply Co., with the request that K and M pipe be used on the job. Several conferences were held between Mr. Koller, the representatives of K and M Company, the representatives of Southern Utility and the consulting engineers after which a “change order” was issued by the engineering firm authorizing the use of K and M asbestos-cement, Type 150, pipe instead of Johns-Manville pipe.
The 11,000 foot of pipeline was laid by the contractor. After the laying of same, the tests, as required for acceptance of said pipeline was commenced by the defendant contractor. Of some 33 tests made at a pressure of 100 pounds per square inch, there were some 19 blowouts or explosions. These blowouts or explosions form the basis of this lawsuit. In repairing these defects, the contractor claims to have expended some $27,549.93. Mr. Koller, the president of the contracting company, claims that he forwarded a letter to Southern Utility in which he back charged the petitioner for the said amount, he claiming, that these expenditures occurred because of defective pipe or fittings supplied him. In response to this letter, the Southern Utility filed a materialman’s lien against Koller in the sum of $32,337.65, alleging that said amount represents the balance due for pipe shipped to this job.
Southern Utility Supply Co. claims that the sole cause of'the blowouts or explosions to the pipeline was caused by defective workmanship by Koller Construction Company; or because of the engineers’ failure to provide proper plans and specifications for the installation. Koller Construction Co., on the other hand, claims that the blowouts or explosions were the result of faulty pipe or couplings furnished it by Southern Utility Company.
On April 4, 1962 Koller Construction Co. filed a rule to show cause against Southern Utility why the lien and privilege should not be erased and cancelled. On April 6th, 1962, Southern Utility Co. filed suit against Koller Construction Co. on open account for $32,327.05, the amount alleged to be due for pipe furnished. The two cases were consolidated for trial. For the purposes of this opinion, Southern Utility Co. will hereafter be referred to as petitioner, Kol-ler Construction Co. will be hereafter referred to as defendant, and Keasbey and Mattison Company will be referred to as K and M.
At the start of trial on the merits, the petitioner sought to amend its petition so as to convert its suit to one on the balance due on a promissory note in the sum -of $39,765.03. In its amended petition it prayed for judgment for $28,231.18 with interest on $21,325.03 from July 18, 1961, until paid and 10% additional on said amount of $21,325.03 and the interest thereon as attorney fees and the additional sum of $6,906.15 and legal interest thereon until paid. Defendant objected to the filing of the amended petition on the grounds that it converted the suit from one on an open account to a suit on a promissory note. It was finally agreed between the parties that, if anything, a balance of $27,549.93 was due on the pipe, and the Lower Court awarded judgment for petitioner in said amount. The defendant has appealed.
*112 The record' discloses that Koller Construction Company has been in business for some 42 years. Its business is mainly in the construction of water and sewerage systems and plants. Mr. Earl Koller, the President of the company, testified that he has been with the company for some ten years during which period he has laid some 100,000 feet of K and M pipe. He testified that he was first approached by either the petitioner or K & M relative to the use of K & M pipe. In this connection several meetings were held between himself, the representatives of petitioner, the representatives of K & M and members of the engineering firm. At these meetings the representatives of K & M and petitioner represented that their pipe would withstand the tests under the circumstances. At the time of these representations, it was questionable as to whether or not K & M pipe would be used on the job.
Mr. Koller who is a graduate civil engineer, testified that the total length of the line was about eleven thousand feet. For about fifteen hundred to two thousand feet near each end of the line, the ground was solid and didn’t contain much moisture. The central two-thirds of the line was in a marshy condition, wherein the ground was soft and the water table was very close to the surface. There was some variation within this central two-thirds area, some parts were harder and drier than others. Several hundred feet of this area required repeated excavation and pumping. In the remaining portion they had no trouble maintaining the trench until the pipe was installed.
Mr. Koller testified that about two-thirds of the line had been backfilled prior to testing. A total of thirty-three tests were run in an effort to get 100 pounds per square inch pressure on the line. There were nineteen explosions or blowouts all occurring at the collars. The thirty-fourth test was made to achieve a lower pressure test. Of these explosions, some occurred on solid ground, on the berm of a levee, and some occurred in marshy terrain. Some explosions occurred after the line had been staked to assure stability. After these explosions, Mr. Koller met with representatives of petitioner and K & M and was told that he would be given credit for his costs resulting from the explosions.
After the pipeline failed to meet the required tests,, the engineers finally agreed to running of a test to determine what maximum test the pipe would withstand without exploding. This test was satisfactory at 60 p.s.i., and the engineer and Sewerage District then agreed to accept the line with the additional provision that both petitioner and defendant give a five year warranty on the pipe. Only the usual one year warranty was required in the original specifications. A letter granting this warranty was given by K & M Co., however, the engineer requested a resolution of the Board of Directors of K & M authorizing this letter. K & M refused to supply the resolution.
Mr. Matherne, the inspector on the job for the engineering firm, testified that he was present on this job one or two hours per day, and that the pipe was installed in accordance with specifications. He testified that the explosions were a result of the collars breaking. These explosions reoccurred even after the pipe had been staked down.
Mr. Arthur DeFraites, Jr., a graduate engineer with DeFraites Associates, testified that the only condition under which K & M pipe was allowed on this job was with the provision that a factory man be on the job full time to insure that every piece of pipe be placed in the ground properly. He stated that Mr. Shelleck of K & M was sent on the job under these conditions.
Arthur DeFraites, Sr.,, a civil engineer of DeFraites Associates, testified as an expert engineer. He stated that he would not approve the use of K & M pipe until he received the “assurance of the manufacturer that the installation would be witnessed by *113 a representative of the manufacturer to ascertain that the method of installing the pipe would he- satisfactory to the manufacturer”. He stated that a representative of the manufacturer was present during the installation. He testified that there were numerous conferences between himself, Mr. Koller, and representatives of K & M and petitioner, and that petitioner and K & M assured him that the K & M pipe could withstand the “severe requirements” of this job. Mr. DeFraites testified that he had used six inch, 150 p.s.i., Johns-Manville pipe under similar marshy conditions on a prior construction job in Terrebonne Parish and that it had proved capable.
Mr. Edward E. Evans, a civil engineer of Baton Rouge testified for petitioner. He testified that he had no experience on sewerage jobs in marshy terrain. In his opinion the blowouts were a result of either the pipe moving beyond its tolerance and rupturing under pressure due to lack of restraining forces, or faulty material.
Mr. William Mashburn, the district sales manager for K & M, testified that he called on Mr. DeFraites after the award of the job to defendant in order to discuss the use of K & M pipe. He testified that they advised Mr. DeFraites that their pipe would perform as satisfactorily as Johns-Manville pipe would perform,, but that they did not represent that their pipe would perform satisfactorily under any and all conditions. Mr. Mashburn further stated that they did not agree to have a man available to supervise the job, however, they did agree to have a man present to instruct the contractor on making up couplings which was normal procedure; however, this was not necessary as the contractor already knew how to make up the couplings.
Mr. C. C. Clubb, Assistant to Mr. Mash-burn with K & M, testified that his first contact with the job was when he was sent to ascertain cause of blowouts. He told Mr. Koller that the company would be fair and pay any damages occurring from defective material. He later refused credit.
Mr. E. R. Lassone testified that he was the Service Engineer of K & M. He was called out on the job by K & M in May, 1961, after the explosions had commenced. He took 14 pictures which were typical of the area in which the pipeline was laid. He testified that the pipe was moving under pressure and the couplings were breaking due to over deflection. On cross examination he testified that he was only on the job for one explosion which occurred in the marsh. The tests were made by applying pressure to still water instead of with running water. Mr. Lassone testified that all of his pictures, except three, showed the one fracture which occurred while he was in the swamp. Of the other three, one looks to the levee showing solid ground, one shows marsh buggy track through marshy terrain,, and the other is a picture of a marsh buggy.
Mr. John Selleck, a salesman for K & M, testified on behalf of K & M that he was present with others at a meeting in De-Fraites’ office for the purpose of gaining the approval of the engineer for use of K & M pipe on this job. The only agreement which they made to the engineer was that their pipe was as good as Johns-Man-ville, and that they would show the contractor how to make up the joints. However, he testified that this was not necessary as the contractor already knew how to make up the joints. Mr. Selleck testified that he was the K & M. representative sent to the job to show the contractor how to make up the collars. On cross-examination he testified that he visited the site six times while the pipe was being laid. After the bréales commenced, he made frequent visits to the site. The pipe was shipped from the factory with the collar on the end of each pipe. This was standard procedure by K & M at that time.
Mr. Arthur DeFraites, Sr. was recalled as an expert witness on rebuttal. He told of some of his experiences in laying pipelines in the marshes of South Louisiana. He testified that he called for no special foundation for the pipeline as it was not *114 necessary. He testified of pipeline jobs through marshes in St. Charles, Terrebon-ne, Lafourche and Jefferson, as well as New Orleans East, where cement-asbestos pipe had been laid without any special foundation. He stated that on this job he was advised by Johns-Manville representatives that it was not necessary to go to 200 p.s.i. pipe. He was shown records where they had installed a 16 inch 150 pound asbestos-cement pressure line from Plaquemines to Baton Rouge. He testified that Johns-Manville could withstand marshland conditions without additional support. Mr. De-Fraites testified that the Johns-Mansville pipe has the spacing ring built into the coupling. With the K & M pipe it is necessary to use a spacing bar. Proper spacing is important because if two pieces of pipe are not properly spaced a deflection occurs, then there is extra stress which will break the coupling. The K & M men assured him they could get proper spacing under the circumstances of this job. He accepted their assurance that their pipe would do the job Johns-Manville pipe could do; and subject to their assurance,, that is the only reason their pipe was permitted on this job.
Mr. DeFraites testified that it is necessary to build into pipelines the ability to withstand the conditions under which the pipeline is laid. His experience with cement block and other foundations in marshland was that after a certain period of time the foundation would move causing the pipeline to yield.
Mr. Earl Roller, on being recalled, testified that this was the first job on which he had used K & M pipe on which the couplings were installed at the factory. On all other projects, the couplings were shipped separately and were installed by the contractor. On this pipe, all the contractor had to do to assemble the pipe was to place a space yoke or spacing bars on the plain end of the pipe and pull it into position. This was an extremely simple procedure. He testified that his personal opinion was “that the collars were simply not strong enough to withstand the hundred pound per square inch test. They would withstand sixty pounds per square inch test without explosion but they would not withstand a hundred pound test.” He predicated this opinion upon his previous experience in laying K & M pipe under similar conditions without difficulty, and, furthermore, upon the premise that this “was also the first and only job on which the couplings were preassembled by the pipe people at the factory.” He testified that “the obvious possibility existed that there was a connection between the two and that shipping the pipe with the couplings attached could have possibly damaged the couplings or in the factory assembly of these couplings they could have possibly been damaged even though they may or may not have been defective in themselves.” “That either the assembly or the shipping of these preassembled collars could have weakened them in some manner.” Mr. Roller further testified that “in view of the requirements of the job and the unusually severe conditions under which the pipe was to be laid, we thought it wise to have this representative (of the pipe manufacturer) there as requested by the engineer and as agreed to by the pipe people, Southern Utility and K & M, in order to see these conditions even though they had been discussed in detail previously.”
The above represents a brief résumé of the evidence adduced in this matter. The contract between the Sewer District and defendant called for 150 p.s.i. pipe. This means that the pipe was to be capable of withstanding a test of 150 pounds per square inch. The evidence discloses that the pipeline as laid could not withstand a test of 100 p.s.i. as required by the specifications. The highest test this line could withstand for some time was 60 pounds per square inch. Therefore, the question is whether the fault is due to faulty installation or faulty material.
There are several points brought out upon trial which lead us to the conclusion that the fault was with the product. The specifications called for 150 p.s.i. Johns-Manville pipe or equal. The engineer on *115 this job testified that he had used Johns-Manville pipe on prior jobs without difficulty, and that representatives of that company assured him that Johns-Manville 150 p.s.i. pipe would be satisfactory under the conditions of this job. Now we must realize that the contractor and engineer were approached by representatives of K & M and petitioner for the express purpose of selling them on the use of K & M pipe on this job. At least one, and most probably more than one, conference was held between the engineer, the contractor and representatives of both K & M and petitioner for the purpose of selling the engineer and contractor on the idea of using K & M pipe. This represented a sizable order for petitioner and K & M.
Although the question of what assurances was given by the representatives of K & M and petitioner to the engineers at these conferences is seriously disputed, both engineers on the project as well as the contractor maintained that the only condition under which the pipe was accepted was • after the officials of K & M and petitioner had assured them that the pipe would function properly under the conditions of the job, and that they would have a factory man present to approve the installation. The evidence shows that a factory man was present on the job on a number of occasions. Although petitioner and K & M attempted to explain this by saying that he was only there to show the contractor how to fit the collars, these same individuals testified that it was not necessary to show the contractor how to assemble the collars as he was already well familiar with this procedure.
Another very important point which leads us to conclude that the material was defective is the evidence that the blowouts or explosions occurred both on firm ground as well as in the marsh. The petitioner’s theory that the pipeline did not have a proper foundation in the marsh certainly would not hold true on the firm soil.
The engineer would not give an opinion on the cause of the blowouts except for the possibility of improper spacing of the pipes at the location of the blowouts causing the couplings to explode. Mr. Koller did theorize that the pipe was shipped with the couplings already attached, and that the damage to the couplings could have been caused either in the assembly or in shipment; that either the assembly or the shipping of these preassembled collars could have weakened them in some manner.
The record further indicates that no objection was made when Mr. Koller advised the representatives that he would back-charge the company for his expenses which resulted from the explosions. Mr. Koller was told that company would be fair. Furthermore, K & M, by letter over the signature of its Vice-President, gave a five year warranty on the pipe and fittings in lieu of the normal one year warranty.
The record shows that there was no fault on the part of defendant. The pipeline was laid in a normal manner, in accordance with good engineering and construction procedure. The fault was in material failure of the couplings. We believe that these failures were probably due to damage in the assembly or transportation.
It has been stipulated by the parties that the sum of $27,549.93 represents the balance due on the pipe. It has been shown that this sum is also the amount of damages sustained by defendant in repairing the explosions. The figures offset one another and accordingly, in the suit on open account the judgment of the Lower Court will be reversed and there is judgment in favor of defendant and against petitioner dismissing petitioner’s demand at petitioner’s cost. In the rule to show cause, the judgment of the Lower Court is reversed, and there is judgment making the rule absolute and ordering the Clerk of Court and Recorder of Mortgages to cancel and erase from his Mortgage Records the inscription of the lien and privilege in question, all at petitioner’s cost.
Judgment reversed.